IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN APPLE IPHONE, CURRENTLY LOCATED AT 601 E. TRADE STREET, CHARLOTTE, NORTH CAROLINA 28202 | Case No. 3:19mj118 |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**

I, Kristen L. Sheldon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation and have been for over 20 years. I am currently assigned as the Airport Liaison Agent coordinator for the Charlotte Division's Joint Terrorism Task Force, where I investigate violations of Federal Law which occur within the airport environment and on-board aircraft.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is an Apple iPhone, containing a gold and black exterior, hereinafter the "Device." The Device is currently located at 601 E. Trade Street, Charlotte, North Carolina 28202.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. On January 16, 2019, Charlotte Mecklenburg Police Department (CMPD) Officer AH was conducting a narcotics interdiction operation at the Charlotte Douglas International (CLT) Airport with a narcotics detection K9. During the operation, Officer AH detected the smell of marijuana coming from a tug containing checked luggage from American Airlines 569. American Airlines 569 had just landed at the CLT Airport; it was a red-eye flight which left the San Francisco International Airport on January 15, 2019. The tug was preparing to transport luggage to Gate E35B for loading onto American Airlines 5045 destined for Norfolk, Virginia.

7. Officer AH, the narcotics detection K9, and additional CMPD Officers went to Gate E35B to further evaluate the tug. The narcotics detection K9 alerted upon two pieces of luggage; both bearing the name 'Ryan Dest Williams' on the baggage tags.

8. CMPD Officer CL boarded American Airlines 5045 and approached the seat, per the flight's manifest, in which 'Ryan Dest Williams' was assigned. The seat was vacant but personal items were within the seat's vicinity. Officer CL was informed by a nearby passenger

2

that the individual, a female, assigned to 'Ryan Dest Williams' seat had been sitting in the seat, but was currently in airplane's restroom.

9. Officer CL approached the airplane's restroom, waited several moments and then knocked on the restroom's door. A black female stepped out of the restroom. Officer CL asked the black female if she was Ryan Williams and she said she was not. Officer CL asked to see a form of identification to which the black female produced a California Driver License bearing the name Lateka Shanae Hampton.

10. Officer CL asked Hampton if she knew Ryan Williams. Hampton advised she knew Ryan Williams and Ryan Williams bought her plane ticket.

11. Officer CL asked Hampton how she was able to get on the plane with a ticket in someone else's name. Hampton did not provide an answer.

12. Officer CL asked Hampton if she had checked any luggage. Hampton advised she did not have any checked luggage. Officer CL told Hampton that a narcotics detection K9 alerted upon two pieces of luggage; both bearing the name 'Ryan Dest Williams' on the baggage tags. Hampton advised she did not check any bags.

13. Hampton was escorted off the airplane, American Airlines 5045 destined for Norfolk, Virginia, by a CMPD Officer.

14. The aircraft Captain was made aware of the ticket/name discrepancy and stated he was not going to allow Hampton to travel aboard American Airlines 5045 because she did not have a ticket.

15. Hampton was asked for her consent to search the two checked bags bearing the name 'Ryan Dest Williams' on the baggage tags. Hampton refused to provide consent for the search. Hampton repeatedly stated the bags were not hers and that she did not check any bags.

16. Officer CL requested to see Hampton's boarding pass. Hampton advised she misplaced her boarding pass. However, Hampton was in possession of two checked baggage receipts which matched the two pieces of luggage the narcotics detection K9 alerted upon.

17. Hampton was detained while Officer AH obtained a search warrant for the two checked bags bearing the name 'Ryan Dest Williams' on the baggage tags.

18. Prior to being detained, Hampton repeatedly utilized a text messaging application on her cellular phone (Device). Furthermore, when asked by Officer AH to release the Device, Hampton continued to utilize the Device. The Device was ultimately taken from Hampton by Officer AH.

19. Pursuant to a search warrant authorized by the Superior Court Division, State of North Carolina, Mecklenburg County, the two checked bags bearing the name 'Ryan Dest Williams' on the baggage tags were opened and approximately 28 pounds of vacuum sealed marijuana was located. Additionally, in Hampton's possession were three Drivers Licenses bearing a photo of Hampton; California Driver License D2160919, Lateka Shanae Hampton; California Driver License A1747402, Valerie Rose Hampton, Texas Driver License 14454043, Ryan Destiny Williams.

20. Hampton was subsequently arrested by CMPD Officers for the following: trafficking marijuana by possession, trafficking marijuana by transportation, possession with the intent to sell and deliver marijuana, and possession of a fake ID.

21. I have reviewed the CMPD Incident Report and CMPD Body Worn Camera footage related to the above incident.

22. On March 18, 2019, I received from the San Francisco FBI office, a DVD containing video surveillance of Hampton at the San Francisco International Airport on January 15, 2019. I viewed the content on the DVD and observed Hampton; whom I recognized from her depictions within the CMPD Officer's Body Worn Camera footage.

23. Within the DVD I identified the following:

   a. Hampton is observed at the San Francisco International Airport with two pieces of luggage which resemble the two pieces of luggage containing the name 'Ryan Dest Williams' which were searched at the CLT Airport.

   b. Hampton is observed attempting to utilize a ticketing kiosk.

   c. Hampton is observed utilizing a cellular telephone (Device).

   d. Hampton is observed at a ticketing counter with two pieces of luggage which resemble the two pieces of luggage containing the name 'Ryan Dest Williams' which were searched at the CLT Airport.

e. Hampton is observed leaving the ticketing counter without the two pieces of luggage which resemble the two pieces of luggage containing the name 'Ryan Dest Williams' which were searched at the CLT Airport.

f. Hampton is observed walking within the public side of the San Francisco International Airport towards a security checkpoint.

g. Hampton is observed transiting through a security checkpoint at the San Francisco Airport.

h. Hampton is observed walking within the sterile/secure side of the San Francisco International Airport.

24. The Device is currently in the lawful possession of the CMPD. It came into the CMPD's possession as it was seized pursuant to Hampton's arrest. Therefore, while the CMPD might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

25. The Device is currently in storage at 601 E. Trade Street, Charlotte, North Carolina 28202. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the CMPD.

26. Based on the facts set forth in this affidavit, probable cause exists to believe that Lateka Shanae Hampton has violated Title 21, United States Code, Sections 841 and 846.

## **TECHNICAL TERMS**

27. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. Based on my training, experience, and research I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, Tablet, IP Address, and the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that

reveals or suggests who possessed or used the device, the identity of other co-conspirators, as well as illegal planning.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

33. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Kristen L. Sheldon
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on April 2, 2019:

_____
DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE